%JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SCOTT DIDONATO

**DEFENDANTS**

LIEUTENANT GENERAL RICHARD C. ZILMER, ET AL

**(b)** County of Residence of First Listed Plaintiff   Phila.
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Anthony J. Sciolla, Jr., Esq.
801 Old York Road, Suite 219
Jenkintown, PA  19046

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☑ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☑ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §1651, 28 U.S.C. §1361, 10 U.S.C. §1552 and 5 U.S.C. §701, et seq.
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE  8/17/10

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

<u>CASE MANAGEMENT TRACK DESIGNATION FORM</u>

SCOTT DIDONATO

                    :         CIVIL ACTION

     v.           :

LIEUTENANT GENERAL RICHARD C. ZILMER; et al    NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)    ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    ( )

8/17/10    ANTHONY J. SCIOLLA, JR., ESQ.
**Date**    **Attorney-at-law**    Attorney for Plaintiff

215-673-9222    215-885-7155    ajsciollajr@msn.com

**Telephone**    **FAX Number**    **E-Mail Address**

(Civ. 660) 10/02

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 8126 Ditman St., 2nd Floor, Philadelphia, PA 19136

Address of Defendant: Deputy Commandant of the Marine Corps, Manpower & Reserve Affairs, Quantico, VA 22134

Place of Accident, Incident or Transaction: _____
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))     Yes☐  No☐

Does this case involve multidistrict litigation possibilities?     Yes☐  No☐

*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
     Yes☐  No☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
     Yes☐  No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
     Yes☐  No☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
     Yes☐  No☐

---

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☑ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
     (Please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
     (Please specify)

## ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I, _Anthony J. Sciolla_ , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☑ Relief other than monetary damages is sought.

DATE: 8/17/10          Anthony J. Sciolla, Jr., Esq.          25365
                       Attorney-at-Law                        Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

---

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 8/17/10          _____          25365
                       Attorney-at-Law          Attorney I.D.#

CIV. 609 (6/08)

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SCOTT DIDONATO                             *
8126 Ditman St.,2nd Fl.                    *
Philadelphia, PA  19136                    *
    and               *
3 Hunters Creek Court                       *
Mullica Hill, New Jersey                    *
             *
    Petitioner,         *
             *
    v.                  *
             *
LIEUTENANT GENERAL RICHARD                  *
C. ZILMER                                   *
Deputy Commandant of the Marine Corps       *
Manpower & Reserve Affairs                  *
Quantico, Virginia 22134                    *
             *
GENERAL JAMES T. CONWAY                     *
Commandant of the Marine Corps              *
The Pentagon                                *
Washington, DC 20380                        *
             *   Civil Action No.
DEPARTMENT OF THE NAVY                      *
The Pentagon                                *
Washington, DC 20380                        *
             *
    and               *
             *
UNITED STATES OF AMERICA                    *
c/o U.S. Department of Justice              *
950 Pennsylvania Avenue, NW                 *
Washington, DC  20530-0001                  *
    Defendants.         *
             *

*   *   *   *   *   *   *   *   *   *   *

## WRIT OF MANDAMUS

1.    Petitioner Scott DiDonato (Petitioner) is a former Marine Lance Corporal (E-3)

who was wrongfully discharged from active duty in the United States Marine Corps in

2001.  In 2003, Petitioner contacted his former Commanding Officer, Colonel Michael

Applegate, USMC, (Applegate) who had processed him for discharge and Petitioner

sought assistance in re-enlisting.  Applegate agreed to help Petitioner, giving legal

counsel, legal advice, and legal assistance in petitioning the Board for Correction of Naval Records to upgrade Petitioner's Re-enlistment Code. In November 2007, through counsel, Petitioner again contacted Applegate to seek assistance in re-enlisting. This time Applegate, now retired, agreed to use his position as a senior executive service manager in the U.S. Marine Corps to re-enlist Petitioner.

2.      As a result of Applegate's direction, the U.S. Marine Corps Recruiting Command initiated contact with Petitioner's counsel and then Petitioner directly to begin the re-enlistment process. Petitioner passed all requirements to the satisfaction of the Deputy Commandant of the Marine Corps (Manpower & Reserve Affairs). The final step designed specifically for Petitioner was a face-to-face meeting with the Deputy Commandant of the Marine Corps (Manpower & Reserve Affairs). Petitioner's counsel arranged the meeting to occur on October 17, 2008 and for both he and Petitioner to be present. After a burst of voicemail messages left by Applegate, Petitioner's counsel was instructed that he could not be present at the meeting, then could not be in the building during the meeting, and then could not even drop Petitioner off at the building for the meeting. Petitioner initially refused to meet the Deputy Commandant of the Marine Corps (Manpower & Reserve Affairs) without counsel and then once an alternative location for Petitioner's counsel to stage during the meeting was discovered, Deputy Commandant of the Marine Corps (Manpower & Reserve Affairs) refused to meet with Petitioner. In November 2008, the Deputy Commandant of the Marine Corps (Manpower & Reserve Affairs) then wrongly and arbitrarily and personally denied Petitioner's enlistment.

3.      From November 2008 through January 2010, Petitioner sought and received an upgrade to his prior enlistment characterization. The Naval Discharge Review Board

upgraded Petitioner's discharge based upon the Marine Corps' 2001 failure to offer Petitioner an opportunity to retrain, the errors Applegate admittedly made in processing Petitioner for discharge, and the characterization being unduly harsh.  Upon his discharge being upgraded, Petitioner, through counsel, contacted Deputy Commandant of the Marine Corps (Manpower & Reserve Affairs), through counsel, to reinitiate re-enlistment processing.

4.      All circumstances were the same, except Petitioner's discharge was upgraded to a favorable characterization of service.  Counsel for Deputy Commandant of the Marine Corps (Manpower & Reserve Affairs) informed Petitioner's counsel that Petitioner could re-initiate re-enlistment processing and he would be treated no different than any other candidate for re-enlistment. Further, Counsel for Deputy Commandant of the Marine Corps (Manpower & Reserve Affairs) stated that if Petitioner "is found qualified and receives any necessary waivers, then he can get into the waiting line to ship to boot camp[sic][1].

5.      After reprocessing all of the re-enlistment paperwork via Marine Corps Recruiting Command and being mentally and physically qualified, Counsel for Deputy Commandant of the Marine Corps (Manpower & Reserve Affairs) informed Petitioner's counsel that based upon several previously unidentified conditions, Petitioner would not be re-enlisted unless conditions changed.

6.      Some of those conditions have changed and Counsel for Deputy Commandant of the Marine Corps (Manpower & Reserve Affairs) refuses to take or return calls from Petitioner's counsel.   Further, the supervising office for the Counsel for Deputy

---

1. Because Petitioner is a prior service Marine, he would not attend boot camp, but instead would receive orders to his assigned duty station.

Commandant of the Marine Corps (Manpower & Reserve Affairs) also refuses to take or return calls to discuss the completion of Petitioner's re-enlistment.

7.     Additionally, the Board for Correction of Naval Records, both in 2004 and 2010 acted in a arbitrary and capricious manner is denying petitioner's request to upgrade his reenlistment code to RE-1.

8.     Petitioner seeks relief pursuant to the All Writs Act, 28 U.S.C. § 1651, 28 U.S.C. §1361, 10 U.S.C. §1552 and Fed. R. Civ. Proc. 65, as well as this Court's inherent authority to grant equitable relief in the form of a Writ of Mandamus.  Additionally, petitioner seeks relief pursuant to Administrative Procedures Act (5 USC §701 et. seq.)

9.     Petitioner seeks the court to compel the United States Marine Corps to complete the re-enlistment processing of Petitioner and re-enlist him into the Marine Corps. Additionally, the petitioner seeks the court to compel the Department of the Navy to upgraded petitioner's reenlistment code to RE-1.

**PARTIES**

10.     Scott DiDonato (a.k.a. Scott Toelk), Petitioner, is a former United States Marine seeking reinstatement (reenlistment).

11.     The Defendant U.S. Department of the Navy is the Agency to which the United States Coast Marine Corps belongs and is headed by Secretary of the Navy, The Honorable Ray Mabus, who has overall cognizance of the Manpower and Reserve Affairs within the Department of the Navy.  The United States Marine Corps is part of the defendant U.S. Department of Navy, and is headed by the Commandant of the Marine Corps, General James T. Conway, USMC, who has overall cognizance of the Manpower and Reserve Affairs within the U.S. Marine Corps.  The Deputy Commandant of the Marine Corps for Manpower and Reserve Affairs ultimately, through counsel, refused to

4

re-enlist Petitioner and refused, through counsel, to engage in good faith discussions in his official capacity as head of Marine Corps Manpower and Reserve Affairs.

## JURISDICTION AND VENUE

12.     Jurisdiction and venue is proper in this Court under the All Writs Act, 28 U.S.C. § 1651, 28 U.S.C. §1361, 10 U.S.C. §1552 and Fed. R. Civ. Proc. 65.   Additionally, Jurisdiction and venue is proper in this Court under Administrative Procedures Act (5 USC §701 et. seq.).

## FACTS

### Prior Service Other Service

13.     Prior to joining the United States Marine Corps, Petitioner served in the US Army for 3 years, 3 Months, and 21 days.

14.     Petitioner was allowed to leave the Army early, after his mother was diagnosed with terminal cancer.  Petitioner was discharged with an under honorable conditions discharge.

15.     During his time in the army, Petitioner was recognized as a "go to soldier" and was considered a valuable asset to his unit.

### Prior Service Marine Corps Service

### Basic Training

16.     In October 1999, Petitioner shipped to Boot Camp at Marine Corps Recruit Depot, Parris Island, SC.   Petitioner enlisted with a guarantee to be a Military Police Officer.

17.     Petitioner graduated with his platoon on 14 January 2000; however, he did not leave the Depot until 15 May 2000.

18.     Petitioner was the victim of serious abuse, maltreatment, and violations of his civil rights during Boot Camp.  What happened to Petitioner some 10 years ago is apparently news worthy today.  His drill instructors made him, and his fellow recruits, drink several canteens of water in a ritual called waterbowling, a practice prohibited in the drill instructor standard operating procedures.

19.     Towards the end of Boot Camp, during one of these waterbowling sessions, after drinking several canteens, Petitioner felt a rip in his stomach and felt sharp stabbing pain in his lower abdomen.  Additionally, he noticed a lump protruding from the same area he felt pain.

20.     Petitioner reported the injury to his Drill instructor, but instead of getting him medical treatment for this obvious injury, Petitioner was mocked and chastised.

21.     Days later and still injured, Petitioner was holding open a door for his fellow recruits and Drill instructors.  After the recruits passed through, his Drill instructor, Sergeant Brown, snatched Petitioner's cover off of his head and punched him in the face with the cover and his fist.  The back of Petitioner's head smashed into the door and he sustained two lacerations to the front of his face.  The results of this assault are documented in his medical records.

22.     After several days, Petitioner was finally sent to medical to get treatment for his injury and was diagnosed with a serious hernia.  Since he was close to completing Boot Camp, he was required to stay with his platoon and graduate.  Surgery was scheduled after Petitioner's graduation from Boot Camp.

23.     After graduation, Petitioner was assigned to Basic Marine Platoon (BMP).  BMP is a holding platoon for recently graduated Marines who are required to stay at the Depot

for various reasons.  Surgery was conducted at the Beaufort Naval Hospital and Petitioner was put on bed rest, no duty, and then light duty to recover.

24.     The delay from diagnosis to surgery was dilatory and Petitioner suffered as a result.   Additionally, Petitioner suffered an injury as a result of medical malpractice during the surgery that went undiscovered for several years.

25.     In 2002, while being treated by a physician in New Jersey for infertility, Petitioner was informed the surgery he had undergone at the Naval Hospital had created a significant problem.  During the surgery, a mistake was made and it left Petitioner unable to have children.  His doctors attribute the injury to a surgical misstep during the hernia operation and this further exacerbates the aforementioned abuse he suffered in Boot Camp.

26.     The Drill instructor assigned to BMP, Gunnery Sergeant Hackler, forced Petitioner to exceed the limits of his "no duty" status by: making him sleep on the top rack (due to the surgery and stitches in the mid-section, extending his torso to get on the top and getting out of the rack caused extreme pain); march in formation, wear his uniform right after surgery, and several other acts.

27.     All of these actions were in violation of the "no duty" chit and all caused Petitioner extreme pain.

28.     Petitioner reported Gunnery Sergeant Hackler's actions to his command and Congressman Robert Andrews' Office.   After reporting it, Petitioner was granted Convalescent Leave to return to New Jersey to recover from his surgery.

29.     When Petitioner returned to New Jersey, he immediately reported the maltreatment by Drill instructors in his Boot Camp Platoon and BMP.  He contacted

Congressman Robert Andrews' office in person on 3 March 2000 and reported the Maltreatment in detail.

30.     In that letter, Petitioner asked to be medically separated from the Marine Corps. Due to concerns for his own safety, Petitioner did not return from Convalescent Leave when his leave expired. He kept in constant contact with Congressman Andrews to see if the Marine Corps was going to discharge him.

31.     On 16 March 2000, Petitioner was told in a letter by Congressman Andrews' office that he would have to return and address his discharge request via the Chain of Command. Petitioner returned to MCRD Parris Island when informed by his Congressman to do so.

32.     Petitioner returned to Parris Island on his own accord – with assurances from the Congressman's office that the matters reported were being looked into and that due consideration would be given to him.

33.     Upon his return, Petitioner was sent to company grade Nonjudicial Punishment for unauthorized absence. He was punished by restriction and extra duty, but he was never required to serve any of the punishment.

34.     Petitioner kept his Military Police contract and he was promoted with his peers.

35.     Petitioner transferred from MCRD Parris Island to Camp Lejeune on 15 May 2000.

**Follow-On Training**

36.     Petitioner reported to and successfully completed Marine Combat Training (MCT) at Camp Lejeune in around June 2000.

37.    During this time at MCT, Petitioner repeatedly requested an update on the investigation into the maltreatment he endured at MCRD Parris Island, but no one could answer his inquiries.

38.    The MCT staff ridiculed him for reporting the maltreatment.

39.    Petitioner also reported to and completed Military Police (Basic) Course at Fort Leonard Wood, Missouri.  He graduated on 1 September 2000 in class 14-00.

40.    During his tour at Military Police School, Petitioner, again, repeatedly requested an update on the investigation into the maltreatment he endured at MCRD Parris Island, but no one could answer his inquiries.

41.    Like he experienced at MCT, the staff ridiculed Petitioner for reporting the maltreatment.

**Reporting To Security Battalion**

42.    After Graduation, Petitioner reported to his first duty station, Security Battalion, Marine Corps Base, Quantico, Virginia, on 2 September 2000 at 0330.

43.    When Petitioner met the Staff Duty Noncommissioned Officer – he got the impression that nothing was going to be different than it was at MCT or MP school.  He felt that the same indifference and harassment was going to continue.

44.    Petitioner also remembered there was never any feedback from the first complaint he made to Congressman Andrews' office on 3 March 2000 and that no one was ever held accountable for inflicting a serious injury upon him.  Now Petitioner was in the mindset he was going to face the same problems for the next few years at Quantico.

45.    That night, in the early morning hours of 2 September 2000, Petitioner made the decision to return to his home of record in New Jersey and re-engage Congressman Andrews for his case.

46.     After returning home, Petitioner contacted Congressman Andrews by phone and then by letter. Congressman Andrews responded to the letter on 5 October 2000.

47.     Also on 5 October 2000, Congressman Andrews contacted the Commandant of the Marine Corps requesting consideration be given to Petitioner's request for discharge and the request for an investigation into the acts that injured him.

48.     Congressman Andrews also requested an explanation why the Marine Corps had not responded to his 16 March 2000 request for information on Petitioner's case.

49.     Also on 5 October 2000, Congressman Andrews wrote to the Navy Inspector General asking for an investigation into the maltreatment of Petitioner and that he be updated accordingly.

50.     The letter to the Navy Inspector General was forwarded to the Marine Corps Inspector General for Marine Corps Matters for action. Ultimately, that same Inspector General letter was forwarded to MCRD Parris Island – where Marine officials did nothing.

51.     On 30 October 2000, Congressman Andrews wrote to Petitioner, explaining to him that since he was UA, the Marine Corps would take no further action until he turned himself in to the Marine Corps.

52.     Upon receiving the 30 October 2000 letter, Petitioner made arrangements to return to Quantico and turn himself in to his unit: Security Battalion.

53.     Petitioner's ex-wife (married at the time) was also a Marine Military Police Officer and was UA during the same time period as Petitioner.

54.     Petitioner told his wife that he was going to return to Quantico and she got viscerally angry. They had an argument about Petitioner returning to his unit and Petitioner left. When Petitioner left to go back to Quantico, his wife made a complaint,

with false accusations, against Petitioner to the local police. At the time he returned, Petitioner did not know a complaint was filed.

55.     On 12 November 2000, Petitioner returned to Marine Corps Base Quantico of his own volition.

56.     When he arrived at Security Battalion, Petitioner requested to speak to Applegate. When he was granted an audience with Applegate, he requested that an investigation be started into the maltreatment, abuse, and harassment that he endured at Parris Island, Camp Geiger, and Fort Leonard Wood.

57.     At the time of this meeting, Applegate was sitting in his office with his feet on his desk and smoking a cigar, blowing smoke at Petitioner. He was greeted with the Colonel calling him: The Infamous Mr. Toelk.[2]

58.     It was right then that Petitioner knew the ordeal was not going to end. There was never any feedback from the reports he made to Congressman Andrews' office in March and September 2000.

59.     No one was ever held accountable for inflicting a serious injury to Petitioner that required surgery.

60.     No one was ever held accountable for violating Petitioner's civil rights.

61.     Petitioner felt he was going to face the same treatment for the next several years at Quantico.

62.     Even though Petitioner was originally from Security Battalion, he was assigned to "casual platoon."

63.     Casual platoon was comprised of between 10-40 Marines returning from long term UA periods – usually over 180 days.[3]

---

[2] At the time, Petitioner's name was Scott Carl Toelk, Petitioner later changed his name to that of his father.

11

64.     Petitioner was required to participate in working parties (grounds maintenance) and complete the legal process.

65.     During this time, Petitioner believes that he was subjected to working conditions where he was exposed to asbestos.

66.     During this time, Petitioner was subjected to other appalling working conditions: 18-plus hour work days and Verbal Harassment by regular Marines (this conduct was later found to be unlawful pretrial punishment by the Circuit Military Judge for the Eastern Judicial Circuit of the Navy Marine Corps Trial Judicial: Lieutenant Colonel Edward Loughran).

67.     It is important to note that Petitioner was subjected to the same treatment and process as a long-term deserters (over 180-days) under the Marine Corps Legal Administration Manual – vice a Marine who turned himself in for a UA period under 180 days.

68.     Applegate wrongly put Petitioner in with casual platoon and it seemed that Applegate was considering the retention of Petitioner accordingly.  Based upon evidence later uncovered, it was revealed this was never Applegate's intention.

69.     At this time in Quantico, Marines who returned from long-term periods of UA (over 180 days or UA from the training pipeline) were processed back into the system and charged at a Special Court-martial.

70.     The Marines were sent to see a Defense Attorney for counseling on the charges.

71.     Each Marine then received individual counseling by a qualified attorney and each Marine made their decision whether to submit a SiLT or go to a court-martial.

---

[3] Marine Corps Base Quantico is a *collection point* for long term UA Marines who either are arrested or returned to Quantico via Cross-country Chaser (HQMC(PSL)) or who return on their own volition and are kept at Quantico for processing.  This collection point status is designated by the Marine Corps Legal Administration Manual.

72.     During this processing, if the Marine wanted an opportunity to stay in the Marines he would be evaluated by Applegate. This happened rarely, but it did happen. This was the path that Petitioner requested and to which Applegate agreed.

73.     Petitioner wanted to stay a Marine, even though he had endured maltreatment and abuse at the hands of his leaders.

74.     Applegate was considering Petitioner for retention in the Marine Corps. Applegate put Petitioner in a leadership position and Petitioner worked very hard for a number of weeks to rebuild his reputation in the Marines.

75.     Petitioner earned the trust of his command and when his case was called in New Jersey, Petitioner was allowed 10 days annual leave to both work on his court case and celebrate Christmas and New Year's Eve with his family.

76.     Just prior to going on leave, Applegate arbitrarily and capriciously decided that he would not allow Petitioner to remain in the MP MOS and that he would not be sent for a new MOS since he had already received MOS training.

77.     This arbitrary and capricious decision not to allow Petitioner to remain a MP after a period of UA and Applegate's erroneous belief that Petitioner could not be trained for a new MOS – led Applegate to force (order) Petitioner to be separated.

78.     This decision and actions was subjective, wrong and unjust.

79.     Applegate pushed the issue further by personally telling Petitioner that if he did not take an OTH (SiLT), I will put you in the brig for the remainder of your time here and give you a dishonorable discharge."

80.     Petitioner felt that Applegate was ordering him to take the SiLT (OTH) and he did. Ordering someone to take an other than honorable discharge, i.e. to take a SiLT, would be an illegal order.

81.     From a Colonel to a Lance Corporal, even implying such a course of action carries the weight of an order.

82.     Further, coming from the convening authority of a pending special court-martial to the accused, such action would be unlawful command influence.

83.     During this entire process, Petitioner had been maltreated and abused and did not feel there was any other recourse than to do what Applegate ordered him do.

84.     Ultimately, Petitioner received an other than honorable discharge on 9 January 2001.

**Post Service**

85.     After his discharge Petitioner spent the next several months getting his life put back together.

86.     Even with the other than honorable discharge, he got a job and began to work his way up in the company.  He remained at that job for nearly 5 years.  Additionally, he tried to get veterans benefits to help him with his aforementioned medical condition and medical malpractice that was inflicted upon him.

87.     Soon after, Petitioner began contacting Congressman Andrews and Senator Frank Lautenberg to ask them to help.

88.     In 2002, Petitioner learned that: the surgery conducted to repair the hernia inflicted by the maltreatment he endured was negligent; and during the surgery, the surgeon committed malpractice resulting in Petitioner being unable to have children.

89.     In 2002, Petitioner contacted the Veterans Administration to seek Veterans benefits for the continued problems caused by the hernia, the operation, and the resulting malpractice.

90.    That Veterans Administration benefit request was denied due to the other than honorable discharge ordered by Applegate.

91.    During this time, Petitioner was still holding a full time job and being promoted to positions of increasing responsibility. (This was the job that he remained at for nearly 5 years).

92.    In October 2003, Petitioner personally organized a fund raiser to support the St. Jude Children's Research Hospital.

**Board For Correction Of Naval Records 2003-2004**

93.    In 2003, Petitioner contacted Applegate, who had relinquished command and been reassigned to HQMC, Manpower and Reserve Affairs.

94.    Applegate was the Branch Head, Manpower Plans and Policies within the Manpower Policy directorate.

95.    Petitioner confronted Applegate with his view that what had happened wasn't fair,

96.    Mr DiDonato told Applegate that he was going sue Applegate and press charges against Applegate because of the treatment that Applegate did to Petitioner regarding the violation of his civil rights and ordering him to take a SiLT (also covering up the investigation into what had happened to Petitioner at boot camp); and

97.    Petitioner asked Applegate to get his discharge upgraded or get back into the Marine Corps.

98.    Applegate began a course of action that for all intents and purposes looked like he was trying to help Petitioner get back into the Marine Corps.

99.    From the outside, this assistance would appear significant since Applegate is the officer that processed Petitioner for the separation in lieu of trial and was now supporting his re-enlistment.

100.   However, later Petitioner discovered this misrepresentation and biased process that was started and finished by Applegate.

101.   After receiving the call from Petitioner in 2003, Applegate enlisted at least two members of the Manpower and Reserve Affairs staff: (1) Captain Kasey Shidell, USMC, and (2) Darhrie J. Hayman, to help in this endeavor.

102.   Petitioner was not completely comfortable of all that was going to be required, so he sought the help of a friend, Matthew Pinckney.[4]

103.   Applegate and Captain Shidell told Petitioner the way to get back on active duty was to petition the Board for Correction of Naval Records (BCNR) to upgrade his RE code.

104.   While theoretically true, BCNR is the forum to get a re-enlistment code upgraded, Applegate's overall plan was not correct, contained a serious omission of fact, and amounted to ineffective assistance of counsel.

105.   Consequently, the advice and work provided by Captain Shidell was ineffective assistance of counsel and his representation violated the Rules for Professional Responsibility for Naval Judge Advocates.   Additionally, there is an inherent bias and conflict of interest in two government employees representing Petitioner in this process.

106.   The BCNR will never upgrade a re-enlistment code to RE 1 of someone with an other than honorable discharge.

107.   On 22 October 2008, the following personnel at BCNR were contacted regarding this issue: Mr. King (703-614-9851/1316), Mr. Silkett (703-614-2133), and Mr. Greer (703-614-1402)

---

[4] Mr. Pinckney was a college student at the time he was helping Petitioner and was doing so as a friend. Mr. Pinckney is now an attorney in South Carolina.

108.    All three indicated that BCNR will not upgrade an RE code to RE 1 if the applicant has an active other than honorable discharge.

109.    In fact, Mr. Greer stated on 22 October 2008, that BCNR will not upgrade a RE code for an applicant that has an other than honorable discharge.

110.    This new information provided by Messrs King, Silkett, and Greer, is additional evidence that Applegate initiated and followed through a materially misleading process in Petitioner's case.

111.    The certainty of denial is supported further by the BCNR brief sheet contained at: it is written on the top of the form "Do the 293," it's written again in the middle of the form next to NDRB review where again "Do the 293," this document at is prepared prior to the board convening and making a decision on Petitioner case, the board already knew what they were going to recommend prior to deliberations.

112.    It was during this phone call that it was learned that Applegate put Petitioner through the wrong process.

113.    However, back in 2003, the wheels were set in motion by Applegate.

114.    Captain Shidell told Petitioner that he needed to write a letter apologizing for going UA, etc.

115.    Petitioner wasn't comfortable writing such a letter since he had been maltreated and abused and had his rights violated; however, he did what Captain Shidell directed.

116.    Captain Shidell had Petitioner write his personal letter to Mrs. Darhrie J Hayman at MMER.

117.    This was bad advice and amounted to a tortuous misrepresentation.

118.    This important letter should have been addressed to the President, BCNR for the upgrade.  SecNavInst 5420.174D

119.   Captain Shidell also told Petitioner to mail his letter, DD 149, and character letters to HQMC (MMER).

120.   This was bad advice and amounted to a tortuous misrepresentation.

121.   This was also counter to the requirements of the Secretary of the Navy Instruction 5420.174D

122.   These important documents should have been mailed to the President, BCNR for the upgrade.

123.   Captain Shidell also had Petitioner sign a release letter so that Captain Shidell could pull Petitioner Official Military Personnel File (OMPF).

124.   There was no rational reason for Captain Shidell to need a Petitioner's OMPF.

125.   Under the circumstances that Captain Shidell had he could not represent Petitioner under the Rules for Professional Responsibility and the absolute conflict of interest; requiring Petitioner to release his records violated Petitioner's privacy rights.

126.   The violations of Petitioner's privacy rights is a violation under the Privacy Act.

127.   Captain Shidell told Petitioner that he would draft a letter for Applegate's signature for the upgrade and put it in Petitioner's file after the file was received at MMER.

128.   Captain Shidell mailed a copy of Applegate's letter to Petitioner after it was signed by Applegate.

129.   Captain Shidell told Petitioner that he was personally putting the letter in Petitioner's BCNR file.

130.   This, created the obvious improper opportunity for documents and matters to be inserted in Petitioner's BCNR petition without Petitioner being able to review the documents and matters first.

131.    In June 2004, BCNR denied Petitioner's petition.

132.    In June or July 2004, Petitioner contacted Congressman Andrews' office to ask him to look into the process and entire affair because Applegate had assured him that the chances of success were excellent with his support in Manpower and Reserve Affairs.

133.    When Petitioner received his file from BCNR he was taken aback.

134.    Petitioner learned that Applegate did prepare a letter for Petitioner's BCNR petition, in fact, he prepared two.

135.    Captain Shidell had forwarded Petitioner a copy of the letter he said was placed in Petitioner's BCNR file.

136.    It was a two-page favorable letter explaining the background and separation process at Quantico.

137.    It also covered Applegate's thoughts about Petitioner: how Applegate believed Petitioner could serve honorably; if Applegate could have moved Petitioner, Applegate would have retained him in the Marine Corps, and that Petitioner conducted himself honorably in credit of his time as a Marine.

138.    The second letter Petitioner saw for the first time when he got a copy of his BCNR file.

139.    The letter that Captain Shidell mailed to Petitioner was not the same letter that Captain Shidell placed into the BCNR File.   It was not nearly as favorable and it contained factual inaccuracies that were prejudicial to Petitioner.

140.    The second letter inaccurately and negligently stated Petitioner was a deserter.

141.    Petitioner was not a deserter, it was unauthorized absence, i.e. he always had the intent to return based upon his constant contact with Congressman Andrews.

142.    Also, and importantly, Applegate states in the second letter that Petitioner was returned to Security Battalion for adjudication.

143.    The assertion that Petitioner was returned is factually inaccurate and extremely prejudicial, because Petitioner returned on his own volition vice being returned as written.

144.    An unauthorized absence terminated by apprehension – as Applegate implied was Petitioner's situation in his second letter – is an extremely aggravating factor.

145.    The methods utilized by Applegate and Captain Shidell were undoubtedly not in line with the Secretary of the Navy Instruction 5420.174D.

146.    Applegate's and Captain Shidell's actions were not in the best interest of Petitioner.

147.    Mrs. Hayman and MMER violated Petitioner's rights by allowing Captain Shidell access to Petitioner's file and allowing Applegate and Captain Shidell to insert documents and evidence into Petitioner's BCNR petition.

148.    Captain Shidell's representation, advice, and assistance to Petitioner is a violation of the Rules for Professional Responsibility because, at the time, he was a United States Government covered attorney.

149.    Neither Applegate nor Captain Shidell should have given advice to Petitioner. If they were going to give advice, it should have been accurate advice.

150.    Additionally, the proven switching of letters and adding evidence into Petitioner's package after submission was blatant and prejudicial.

151.    The check and balance was violated in Petitioner's case when Mrs. Hayman allowed Applegate and Captain Shidell access to Petitioner's file and allowed them to insert documents and evidence.

152.   There was never a chance that the BCNR was going to upgrade Petitioner's re-enlistment code while he still had an other than honorable discharge and Applegate, Captain Shidell, and Ms. Hayman all knew this was the case.

153.   Had any of these three government personnel told Petitioner to speak to a lawyer vice Applegate and Captain Shidell giving him advice and coercing this whole process, a viable course of action could have been planned and Petitioner could have petitioned the NDRB to get the discharge upgraded, then petitioned the BCNR to upgrade the re-enlistment code.  This further shows these three individuals conspired in this fraudulent process, which amounts to a tortuous misrepresentation.

154.   All Applegate or Captain Shidell would have had to do was make one phone call to BCNR and ask them for the best course of action for Petitioner to get him re-enlisted.

155.   When reviewing Applegate's letter supporting Petitioner's discharge upgrade – then as now - the assertion that Petitioner could neither serve as a Military Police Officer nor be sent for a new MOS – is completely arbitrary and capricious and not based on fact or regulation.  Key factors:

156.   Petitioner was gone for a short period of time over 30 days and he returned voluntarily.

157.   Petitioner left out of actual fear of what had happened to him and what would happen to him in the future.

158.   He talked to Congressman Andrews immediately upon his arrival in New Jersey and he complied with the direction of Congressman Andrews when informed he needed to return to have his complaint heard.

159.   There is nothing in Petitioner's case that would have precluded him from serving as a Military Police Officer: in Security Battalion or otherwise.

160.    Additionally, Petitioner's wife was both an MP and UA for longer than Petitioner and she was allowed to continue to serve both in the Marine Corps and as a Military Police officer.

161.    Note the disparity in treatment and the lack of equity applied to Petitioner.

162.    This is clearly an incident of gender bias.

163.    This is a clear violation of Petitioner's civil rights.

164.    Justice must be afforded to Petitioner.

165.    A presumption of regularity would necessarily be required to be based upon a regulation – and nothing supports this course of action or rationale.

166.    Even Applegate states that Petitioner served honorably and that he wanted to keep him on active duty because he felt he could continue to serve honorably.

167.    At the time of discharge, Applegate subjectively and mistakenly believed Petitioner could not serve as an MP or go to a different MOS, and ordered Petitioner discharged.

168.    Specifically, Applegate states that "If I had been able to move Scott to another MOS, I would have retained him in the Marine Corps."

169.    There were several alternatives:   Lateral Move or OJT just to name a few. Additionally, Petitioner could have PCA'd to a different unit within the National Capital Region at no cost to the government.

170.    When looking closely at all of the documents in the BCNR package, several other things looked inappropriate.

171.    Again, at the time of his petition to the BCNR, Applegate and Captain Shidell told Petitioner to send his package to MMER and to address his letter to a Mrs. Hayman.

Applegate and Captain Shidell obviously had prior discussions about Petitioner's facts and circumstances with Mrs. Hayman.

172.   As is reflected in the BCNR package, when Petitioner's package eventually worked its way to BCNR in Washington, DC, BCNR in turn sought an advisory opinion from MMER: the same office to which Petitioner just mailed his application and the same person to whom he addressed his letter.

173.   The evidence shows Mrs. Hayman, the addressee of Petitioner's letter, was also the person who conducted the MMER review of Petitioner's record for BCNR.

174.   There is no possible way that Applegate and Captain Shidell did not know what Mrs. Hayman would opine before it ever went to BCNR because there was preparatory collusion prior to Petitioner mailing the package to MMER. (This shows intent to misrepresent material facts and to conspire against Petitioner.)

175.   The collusion amongst Applegate, Captain Shidell, and Mrs. Hayman cannot be understated.

176.   Applegate and Captain Shidell spoke to and worked with the person from whom BCNR would seek the "Marine Corps Official Advisory Opinion."

177.   Mrs. Hayman had Petitioner's BCNR petition and his official military personnel file provided by Captain Shidell.

178.   There can be no doubt that before Petitioner's package was forwarded to BCNR – everyone knew what the result was going to be from BCNR.

179.   The fact this was not disclosed to Petitioner is inappropriate and prejudiced Petitioner.

180.   The behind the scenes dealing and switching of documents in Petitioner's petition was obviously detrimental to Petitioner's case and petition and resulted in prejudicial

actions and results.   Additionally, this continues to show intent to misrepresent and conspire against Petitioner.

181.   As a result of his concern and suspicions, Petitioner again contacted Congressman Andrews' office via a "Request for Assistance" in July and August 2004 – after he received the aforementioned documents from the BCNR.

182.   As a result, Petitioner received a letter from Congressman Andrews acknowledging his request for assistance and providing a copy of the Congressman's letter of 13 September 2004 to the Commandant of the Marines Corps.

183.   Significantly, in the 13 September 2004 letter authored by Congressman Andrews is Petitioner's assertion that Applegate ordered Petitioner into accepting a SiLT and an OTH – and Applegate now endorses Petitioner's honorable service – referring to the BCNR letter.

184.   Petitioner received correspondence from the Marine Corps in response to the matters addressed in Congressman Andrews' 13 September 2004 letter.

185.   With that correspondence (Marine Corps Response) was a "copy" of Congressman Andrews' letter which had been illegally altered from its original form.

186.   The alterations remove Petitioner's serious concerns and assertions that Applegate ordered him to accept the SiLT and OTH discharge and the inequitable treatment given to Petitioner's wife – who was UA for well over 30 days, was an MP, and allowed to remain in service as an MP.

187.   Petitioner checked with Congressman Andrews' office in New Jersey during the week 4 February 2008 and was informed there was only one letter drafted by the Congressman's office and that it was the letter that included Petitioner's assertions and was signed by the Congressman.

188.   Likewise, Mr. Ben Graziano (854-546-5100 x105) on 6 November 2008 confirmed that one 2 page letter was sent by the Congressman's office.

189.   The 13 September 2004 Congress Andrews' letter was altered during the process somewhere in Manpower and Reserve Affairs.

190.   Taking into consideration that earlier someone (Applegate or Shidell) switched or substituted Applegate's favorable letter for the BCNR petition to a less favorable one, it begins to paint a picture they altered the letter.

191.   On 24 October 2004, Major Pete Houtz, USMC, the Military Justice Officer, Marine Corps Base, Quantico confirmed that the billet Captain Shidell was serving in at the time of the erroneous BCNR process and the altering of the Congressman's letter was MPP-LEGAFF[5] working for Applegate.

192.   In that billet, Captain Shidell answered requests for information from the house and senate and would have been the one who would have answered this inquiry by Congressman Andrews.

193.   The only people who benefited from altering Congressman Andrews' letter were Applegate and Captain Shidell.

194.   Congressman Andrews' letter also reminded the Marine Corps that Petitioner has been reporting the abuse and maltreatment he endured since 2000 and the requests of the Congressman to investigate have gone unanswered.

195.   To that point, Congressman Andrews followed-up on 8 December 2004.

196.   At the time of the 8 December 2004 letter, there was never an investigation into the allegations and abuse.

---

[5] https://www.manpower.usmc.mil/portal/page?_pageid=278,2546204&_dad=portal&_schema=PORTAL

197.    No investigating officer ever spoke to Petitioner about the matters of which he reported and the only feedback Petitioner had received from the Marine Corps is that "a lot of time has passed or too much time has passed."

198.    On 31 January2005, the Marine Corps (Lieutenant Colonel Taym Gude) outrageously responded to Congressman Andrews 8 December 2008 letter that: due to the fact that Petitioner was no longer a member of MCRD Parris Island, that there were no named witnesses, and Petitioner was UA – the Marine Corps closed the investigation on 17 November 2000.

199.    This response is preposterous and inappropriate.

200.    Petitioner did transfer from MCRD Parris Island, like every graduating recruit does, but he was still a Marine.  It's ridiculous that the Marine Corps would try to tell Congressman Andrews that they cannot investigate abuse and maltreatment if a Marine transfers to another duty station.

201.    Petitioner was never interviewed – not at Parris Island, Camp Lejeune, Fort Leonard Wood, or Quantico to give the name of the witnesses.

202.    Petitioner was not UA on 17 November 2000 – he returned on 12 November 2000; therefore, Lieutenant Colonel Gude provide false and inaccurate information to Congressman Andrews.

203.    In recent months, Petitioner – on his own – has been able to find at least 2 of his former drill instructors (still on active duty).  One is on recruiting duty and one is assigned to Special Operations Command at Camp Lejeune.  He likewise has contact with former recruits who were victims of similar abuse and who witnessed the abuse inflicted upon Petitioner. This case is not cold and is being investigated.[6]

---

[6] Petitioner through Mr. Stackhouse reported these matters to the Marine Corps IG's office on 28 October 2008 to Investigator Morgan and an investigation was opened.[33]

204.    This entire line of correspondence is an attempt by the Marine Corps to cover-up the fact that these serious allegations, supported by hard evidence (medical records and eye witnesses), went un-investigated and, as a result, they let Petitioner down in the process and essentially blew-off a United States Congressman.

**Reenlistment Process 2008**

205.    In February 2008, after being contacted again – Applegate began the apparent process of working behind the scenes to get Petitioner re-enlisted into the Marine Corps.

206.    Applegate has since retired and is Director, Manpower Policy, within Manpower and Reserve Affairs. He is currently a member of the Senior Executive Service.

207.    There are several things that happened during this process that demonstrate this entire process was inept if not fraudulent and that Petitioner was again prejudiced by Applegate's actions.

208.    On 6 February 2008, Applegate received a synopsis of Petitioner's situation from Boot Camp to the present.

209.    It included 2 courses of action to get Petitioner back on active duty: get pre-approval of the OTH waiver so he could re-enlist though Marine Corps Recruiting Command (MCRC) or getting re-enlistment authority from Manpower and giving him orders.

210.    Applegate responded on 7 February 2008 that he got it and would work on it.

211.    From 7 February 2008, Applegate had solicited the help of several field grade and General Officers to re-enlist Petitioner.

212.    At a minimum, Applegate addressed Petitioner's case with:  Colonel Bartch (Lieutenant General Coleman's EA) 703-784-9012, Colonel Fenstermacher (MM) (retired),  Brigadier General Kessler (MM) 703-784-9200,  Major General Tryon

27

(MCRC) 910-451-0697, Brigadier General Milstead (MCRC) 703-784-9400, and Lieutenant General Coleman (M&RA) 703-784-9012.

213. On 20 February 2008, Applegate forwarded the synopsis to Marine Corps Recruiting Command and Manpower Separation and Retirements for advice and their recommended course of action.

214. After conferring with all of the major officials in Manpower and Reserve Affairs and Marine Corps Recruiting Command, the plan was approved.

215. On 3 March 2008, after reviewing the details of the synopsis – including the New Jersey legal issue and the other than honorable discharge, Major General Tryon had Master Gunnery Sergeant Patrick S. Arbec, Operations Chief, MCRC, contact me to get Petitioner's contact information.

216. Once Petitioner's information was provided to Master Gunnery Sergeant Arbec, the Marine recruiters in New Jersey contacted Petitioner to begin the re-enlistment.

217. The witnesses and evidence to this conduct between Applegate and Major General Tryon include: Several emails from Applegate, Master Gunnery Sergeant Arbec (MCRC, Operations), Sergeant Boone (RS New Jersey), and Gunnery Sergeant Cole (RS New Jersey).

218. During the re-enlistment process at the Recruiting station level – Petitioner was processed for re-enlistment; however his re-enlistment waiver was not done in accordance with or in the spirit of the MPPM.

219. The MPPM requires that: "Whole Person" concept be used because: "waiver requests which simply identify the disqualifying factor(s) without thorough discussion of all mitigating circumstances and the applicant's favorable traits are a disservice to the applicant and may well jeopardize waiver approval." MCO P1100.71B Vol.II.

220.    Without the Operations Section at each level ensuring that all relevant favorable, mitigating, and extenuating information were contained in the record, the spirit of the MPPM was not followed and this further evidence an inept process.

221.    When Petitioner was processed through medical at the Military Entrance Processing Station, he was treated inappropriately.

222.    His documents and prior characterization were highlighted by members of the Medical Staff writing OTH in large letters on his packet and staff spoke disparagingly to him about his discharge characterization.

223.    Even Dr. L. Gorelli, Chief Medical Officer, at the MEPS made disparaging comments to Petitioner and then held up the re-enlistment process inappropriately.

224.    The members of the Recruiting Station treated Petitioner with varying degrees of respect because of his discharge.

225.    The Recruiting Station had the recruiters at the Recruiting Sub-station run him though the IST/PFT on multiple occasions with no apparent reason.

226.    The Recruiting Station submitted scores that did not include the highest scores that Petitioner received on the fitness tests. For example, Petitioner completed 100 crunches and 15 pull-ups, but the Recruiting Station forwarded 44 crunches and 3 pull-ups.

227.    By the Recruiting Station not forwarding the most favorable information, it continues to create a suspicion of fraud.

228.    This information can be verified by Gunner Sergeant Cole and Staff Sergeant Fuller both recruiters of Recruiting Station  New Jersey who worked on Petitioner's re-enlistment.

229. Gunnery Sergeant Cole and Staff Sergeant Fuller's number at the Recruiting Sub Station Woodbury, NJ is 856-845-1240 where this information can be confirmed.

230. The re-enlistment process at the recruiting station level was painfully slow – partially due to a delay at the MEPS.

231. It took from March 2008 until July 2008 for Petitioner's enlistment package to move through the Recruiting Station.

232. During this time, Major General Tryon checked on the processing of Petitioner via Applegate on multiple occasions.

233. Additionally, on 13 May 2008 Applegate stated that Major General Tryon had discussed Petitioner's re-enlistment with the Commanding General, Eastern Recruiting Region, Brigadier General Laster, telling him to ensure that Petitioner's re-enlistment package made it to him.

234. These matters further demonstrate Major General Tryon's knowledge and involvement and support.

235. It's important to note that on one occasion, around the first week of July 2008, the RS Operations Chief told Petitioner that he was never going to get back into the Marine Corps. The operations chief at MCRS New Jersey can be contacted at: 732-866-2900.

236. With the interpersonal relationships between the Operations SNCOs up the chain, such an attitude at the RS level is concerning in a process initiated by the Commanding General.

237. This statement by the Operations Chief further evidences further collusion.

238. Once Petitioner's package left the Recruiting Station on 7 July 2008 to the 1st Marine Corps District, it progressed through the endorsement chain.

239.   Petitioner's re-enlistment package arrived at Eastern Recruiting Region on 16 July 2008.

240.   Petitioner's re-enlistment package was at Marine Corps Recruiting Command on 28 July 2008.

241.   Petitioner's re-enlistment package was forwarded to Manpower on 5 August 2008.

242.   Prior to signing off on Petitioner's re-enlistment, Major General Tryon executed PCS orders and was replaced by Brigadier General Milstead.

243.   Applegate stated that he discussed Petitioner's re-enlistment with Brigadier General Milstead as well.

244.   In the end, his enlistment ultimately received a negative endorsement from Brigadier General Milstead.

245.   This negative endorsement flies in the face of Major General Tryon's endorsement of the process.

246.   Major General Tryon knew that Petitioner had an OTH and knew of Petitioner's background BEFORE the enlistment process began.

247.   Petitioner's re-enlistment was initiated at the Commanding General level – which is the same level of waiver Petitioner needs to re-enlist.

248.   It's inconceivable Major General Tryon expended the manpower, time, and money to put Petitioner through this painfully slow 9-month re-enlistment process if he were not intent on re-enlisting Petitioner.

249.   It's inconceivable that Major General Tryon would have made personal inquiries into the status of the re-enlistment on multiple occasions and personally called his subordinate Commanding General if he were not intent on re-enlisting Petitioner.

250.   In effect, Major General Tryon had waived Petitioner's OTH when this process began and Brigadier General Milstead countermanded that senior General's waiver.

251.   There is something utterly suspicious of that change of direction and it furthers the suspicion of tortuous conduct, i.e. that Petitioner was put through a process that was never going to result favorably.

252.   Petitioner's re-enlistment package languished in Brigadier General Kessler's office for weeks.

253.   Brigadier General Kessler had a meeting on 14 August 2008 regarding Petitioner's re-enlistement.

254.   At the time of the meeting, Petitioner's re-enlistment package had already been through Brigadier General Kessler's primary staff and was sitting on his desk for about a week.

255.   During the meeting, Brigadier General Kessler expressed his concern was only that if one OTH was re-enlisted, then others would come up for re-enlistment and it created a slippery slope concern.

256.   The OTH is what everyone knew about before this process began.

257.   After that meeting, the package sat in Brigadier General Kessler's office, again, for weeks.

258.   On 8 September 2008, after trying to arrange a meeting between Petitioner and Lieutenant General Coleman regarding Petitioner's re-enlistment, a letter and binder of enclosures was delivered to Lieutenant General Coleman regarding Petitioner's re-enlistment.

259.   The binder was replete with documentary evidence to support re-enlisting Petitioner and all of the problems seen in the re-enlistment process.

260. To add to the delay, Lieutenant General Coleman's office forwarded the letter addressed to Lieutenant General Coleman to Brigadier General Kessler.

261. There were follow-on letters expressing concern for the inordinate delay, possible fraud/misrepresentation in the recruiting process, and issues in the endorsement process during the change in command of Generals Tryon and Milstead.

262. Mr. Calvin Swain (Deputy MM) 703-78409200 stated on 16 September 2008 that he was reviewing the re-enlistment of Petitioner for Brigadier General Kessler – this is almost 7-weeks after the re-enlistment package was physically sitting on Brigadier General Kessler's desk.

263. On 25 September 2008 Mr. Swain finally forwarded the re-enlistment package back to Brigadier General Kessler on 24 September 2008, but refused to provide any amplifying information as to his opinions, recommendations, and advice to Brigadier General Kessler.

264. After receiving the package from Mr. Swain, Brigadier General Kessler forwarded the package back to Colonel Bartch, Lieutenant General Coleman's EA.

265. Inexplicably, on 25 September 2008, all of the letters and enclosures were sent from Lieutenant General Coleman's office to Applegate for his review.

266. This is very concerning because this entire process started with Applegate some 8 years ago, There was derelict processing, inappropriate activities, and collusion in Petitioner's RE code upgrade request by Applegate; his lawyer, Captain Shidell; and Mrs. Hayman in 2003/4, and

267. It is additionally concerning because of the illegal activity with the Congressman's letter in 2004 that favored Applegate.

268.   By Colonel Bartch's action of giving the binder to Applegate, the allegations of misconduct against Applegate are disclosed to Applegate – by the same personnel that he is supposedly working with to re-enlist Petitioner.

269.   The fact that Petitioner was denied any information regarding the context and deliberative process on Petitioner's endorsements, but the same individuals that denied explanation then forward the allegations against Applegate to Applegate – creates the suspicion of misrepresentation.  When all that is added to the fact that Applegate began this entire re-enlistment process through his relationships with the aforementioned officers, if further compounds the concern of giving him all of our letters addressed Lieutenant General Coleman.

270.   Applegate met with Lieutenant General Coleman sometime between 1-7 October 2008 to discuss Petitioner's re-enlistment and to try to arrange a meeting Lieutenant General Coleman and Petitioner with counsel.

271.   The purpose of the meeting was to assist Lieutenant General Coleman in understanding all of the tribulations in the recruiting process and what has transpired over the years.

272.   On 7 October, Colonel Eric Bartch, Lieutenant General Coleman's Executive Assistant, called to inquire into whether an agreement could be worked out where Petitioner would drop his re-enlistment in exchange for Applegate writing a letter saying it was a mistake to discharge Petitioner, and Manpower and Reserve Affairs supporting an honorable discharge upgrade– so that Petitioner could petition the NDRB to try to upgrade his discharge.

273.   Applegate confirmed on 17 October 2008, that he had this discussion with Colonel Bartch and that he would write such a letter.

274.    In the end, this was an attempt to dissuade Petitioner from continuing the re-enlistment process that they put him through over the previous 8 months, but upgrade his discharge to honorable.

275.    It's important to note that this "offer to negotiate" only came up when we threatened to expose the potential that this process may be fraudulent and our desire to right the wrongs against Petitioner.

276.    Clearly, Applegate and Colonel Bartch and, by implication, Lieutenant General Coleman, understood what happened to Petitioner in 2000 was a mistake.

277.    The next day, Petitioner's concern that the NDRB could still say no, Petitioner still would not be back in the Marines, and that we wanted a meeting with Lieutenant General Coleman was sent back to Colonel Bartch.[44]   Colonel Bartch was told that Petitioner would be going forward with civil actions and filing a complaint if that did not happen.  Additionally, he was told that Manpower had until 9 October 2008 to agree.

278.    On the evening of 9 October 2008, Applegate left the following voicemails:

279.    This is Mike Applegate.  Why don't you give me a call Friday morning if you're able.  I don't have a final word on DiDonato, but it is looking good.  I'm a lot more hopeful that I was a while ago.  It's just that General Coleman wants to see DiDonato Face to Face and I think this is a very good sign.  I've been working this hard all week.  Just give me a call tomorrow.  The number to call on is 703-784-9350.  Hope to talk to you tomorrow Phil.*

280.    This is Mike Applegate here.  Why don't you give me a call back Friday morning if you can at the...this number 703-784-9350.  News is looking....the prognosis is looking pretty good.  General Coleman wants to see DiDonato Face to Face to make the

final call.  It's a very good sign.  Go ahead and give me a call so we can set this up.
Thanks, have a good day."

281.    In the morning of 10 October 2008, Applegate sent an email stating Lieutenant
General Coleman had agreed to a meeting.

282.    After receiving the email about the meeting, Applegate left the following two
voicemails:

283.    Phil, Mike Applegate.  Just got your email, will you please give me a call.
Basically I want to try to arrange a time and date, for the meeting potentially next week.
The number is 703-784-9350.  Thanks."

284.    Hey Phil, this is Mike Applegate.  Please give me a call.  It's about Scott trying to
meet with a General Coleman. 703-784-9350. Thanks."

285.    The plan was to arrange for a meeting on 17 October 2008, but due to scheduling
issues and a federal holiday it took a couple of days to set it up.

286.    On 15 October 2008, the day after the Columbus Day 96, through Captain Solis,
Lieutenant General Coleman's aide, a meeting was scheduled with Lieutenant General
Coleman for 17 October 2008 at 1400.

287.    On 16 October 2008, Applegate provided information that the meeting was
canceled because Petitioner wanted his attorney present at the meeting.

288.    Applegate stated that Lieutenant General did not want Petitioner's attorney in the
meeting and that's why the General canceled it.  Petitioner could meet with the General
alone, but such a meeting was unacceptable.

289.    Later on 16 October 2008, Applegate left another voice mail stating that the
meeting was back on with the General, but only Petitioner could be there. He said the
following:

290.     Phil, this is Mike Applegate. I talked to General Coleman. He's willing to see Scott, but Scott only and you really can't be in the building. This is gonna be a done deal, I believe, if you let him come in and see the General. Please give me a call. Number is 703-784-9350."

291.     Petitioner has been the victim of violations of his rights, person, and due process by senior members of the Marine Corps and he deserves to have his representative there, he needs to have his representative there, and to make him forgo counsel in such a high level meeting is again a violation of his rights.

292.     On 17 October, in a phone call, Applegate stated that he was arranging again the meeting with Petitioner – but again reinforced that Petitioner's representative could not attend.

293.     He also stated that the Lieutenant General Coleman was willing to meet with Petitioner, but that his counsel could not even be in the building

294.     Applegate stated he believed that if Petitioner sees the General: "he will get in."

295.     Applegate offered to pick-up Petitioner at the MCX at MCB Quantico and drive him to the meeting at M&RA.

296.     Applegate expressed that the General wanted to look Petitioner "in the eye," so that the General could explain to Petitioner's new commander why he decided to re-enlist Petitioner and that he had personally met with Petitioner.

297.     Applegate stated that 5 times in the last week that General Coleman almost signed the re-enlistment paperwork, but that the General wanted to see Petitioner before he did so.

298.     Applegate stated that the General did not want Petitioner's counsel to come to the meeting because non-lawyers do not like to deal with lawyers; this meeting was a

Commander to Marine meeting and did not require a lawyer; the General had already heard enough from Petitioner's lawyer through correspondence.

299.   Applegate related that he had told the General that Petitioner only wanted his lawyer present because he had "been burned in the past," but regardless the General did not want Petitioner's lawyer to accompany Petitioner.[7]

300.   Applegate stated that Colonel Bartch, General Coleman's EA, had talked to Applegate during the first week of October about upgrading Petitioner to an Honorable/RE1 to ease the path of re-enlistment.

301.   Applegate told Colonel Bartch that he was supportive of setting aside the NJP in Petitioner's record – which he could do as the commander – and upgrading him to Honorable/RE1.

302.   Applegate stated he and M&RA were looking at ways to upgrade Petitioner to Honorable/RE1 and that Captain Randy Stone, the M&RA judge advocate on staff (Captain Randy Stone), would figure out how to do it.

303.   The goal Applegate expressed was issuing a new DD214 with an Honorable discharge and an RE 1 re-enlistment code. That way, Petitioner would arrive at his new command with a clear record that would only reflect his broken time.

304.   Later, on 17 October 2007, at 1330, Captain Randy Stone, the M&RA Judge Advocate, met with Petitioner's lawyer at The Marsh Center, aboard Marine Corps Base, Quantico.

---

[7] It's important to note here that the only time that Petitioner was burned by meeting with a Commander without a lawyer was when he met with Applegate in 2000. It was during this meeting that Applegate brought Petitioner into his office, sat back in his chair with his foot on the desk, and Applegate told Petitioner to take the OTH or he would go to jail for the remainder of his time and receive a Dishonorable Discharge. This type of conduct is what gives Petitioner concern about meeting with Lieutenant General Coleman alone – without counsel.

305.   Captain Stone stated that he had received his "marching orders" from Applegate to do two things: Arrange a meeting with Petitioner and the General, coordinated via Captain Stone, Captain Solis, and Petitioner's attorney and to find a way to clear Petitioner's record by getting a new DD214 issued with an Honorable Discharge and RE1 code.

306.   Captain Stone stated that the full intent was to have Petitioner's record clear for check-in at his new unit.

307.   Captain Stone additionally stated that Petitioner's re-enlistment was "just about a done deal."

308.   On 17 October 2008, at around 2115, an email was sent to Captain Stone to let him know that since everyone agreed that Petitioner should have his NJP set aside and his DD214 upgraded to reflect a Honorable discharge and RE 1 code, that Mr. DiDonat wanted that done immediately and then would schedule Petitioner's meeting.

309.   On 20 October 2008, Captain Stone emailed to clarify what Petitioner asked for and Captain Stone was told that it shouldn't take more than a day or so to make it happen; therefore, they can upgrade the discharge to honorable and the RE code to RE 1 today or tomorrow and the meeting could take place tomorrow afternoon or Wednesday.

310.   By email, on 21 October 2008 Captain Stone acknowledge the email from 20 October 2008 and stated that he was still researching the upgrade to Honorable/RE1, that he wasn't sure that we'd get the upgrades and meeting done this week because of his research, and that he was going to brief Applegate on the status.

311.   At 1048 on 21 October 2008, Applegate stated in a phone call that the upgrades were not going to happen before the meeting.  Further he stated: that Petitioner either "comes to meet the General alone or it's over;" that he couldn't "emphasize enough that

the re-enlistment was a done deal if Petitioner comes in to meet the General;" that there would be no preconditions, i.e. they would not upgrade Petitioner's record to Honorable/RE1 until after the meeting with the General; and that Petitioner's attorney would not be allowed in the meeting with Petitioner.

312.   Applegate was told that Petitioner had a concern with meeting Lieutenant General Coleman alone and there was no reason to not do the upgrades first.  Objectively, the concerns are obvious: this is a meeting between a 3-Star General and a prior Lance Corporal, there will naturally be some apprehension; and, each time Applegate has said he would do something for Petitioner, it failed.

313.   Additionally in 2000, Applegate told Petitioner that he would be retained, then changed his mind and ordered him to accept an OTH or go to the brig for the rest of his time at Quantico and to get a dishonorable discharge.

314.   Further in 2003, Applegate told Petitioner that he would help him get back into the Marine Corps and that going to BCNR was the way to do it.  That process was never going to work according to BCNR – and Applegate substituted a different, less favorable letter after giving the favorable one to Petitioner.

315.   Now, in 2008, with the help of several Field Grade and General Officers – this re-enlistment process was hitting the 8 month mark.  Petitioner's attorney was the one who helped Petitioner get the package to the place that it was, and now they were cutting his attorney out of the picture when the decision was to be made.

316.   This was a legal process that was going to define Petitioner's future for the next several years and his veteran status for the rest of his life, he wanted his lawyer there to ensure his rights were protected.

317.   Captain Stone sent an email at 1334 on 21 October 2008 asking about setting up a meeting with Petitioner and Lieutenant General Coleman.

318.   At 1557 on 21 November 2008, Captain Stone made a call to Petitioner's attorney to discuss Petitioner.

319.   When asked why there was an issue with doing the upgrading to Honorable/RE1 before the meeting – his response was: that the General wanted to do the meeting first and that it was the General's decision and that Petitioner's attorney was still not welcome at the meeting.

320.   At 1734 on 21 October 2008, an email was to Captain Stone telling him that Petitioner would not meet with the Lieutenant General Coleman alone, the process appeared fraudulent, and that Petitioner would be pursuing other actions.

321.   At 1256 on 22 October, an email was sent to Captain Stone informing him that he was a witness to this process based upon the information he told me about getting "marching orders" to work on: upgrading Petitioner's discharge to Honorable, and upgrading Petitioner's RE code to RE1, setting aside the NJP in his record, and that now there was a stipulation that Petitioner meet with the General first before receiving the upgrades.

322.   Applegate and Captain Stone both have stated that Manpower and Reserve Affairs was going to upgrade Petitioner's discharge to Honorable, his RE code to RE1, and that his NJP would be set-aside.

323.   Since those changes were agreed to and Captain Stone began researching the method to accomplish those upgrades expeditiously, nothing has changed regarding Petitioner.

324.   The fact that Lieutenant General Coleman refuses to allow Petitioner's attorney to accompany Petitioner and that has stymied the meeting in no way affects Petitioner's characterization of past service.

325.   Since he merited an upgrade in October 2008, he still must merit an upgrade now.

326.   On 16 October 2008, Applegate left a voicemail stating that the re-enlistment was a "done deal."  On 21 October 2008, Applegate stated that he couldn't "emphasize enough that this is a done deal if Scott comes in and meets with the General."

327.   If he merited re-enlistment on the 21 October 2008 and he merited upgrades on 21 October 2008 – he merits them both today as well.

328.   At the end of the day, Petitioner has documented evidence of the abuses he has endured and his rights being violated - in his medical records and an 8-year history of reporting the abuses he endured

329.   Unfortunately, this record also documents 8 years the Marine Corps has failed to investigate the abuses.

330.   Additionally, documents were missing from Petitioner BCNR petition and a congressional letter has been altered – and since Petitioner has copies of both letters signed Applegate and both letters from Congressman Andrews - eventually, someone will have to answer those questions.

331.   The aforementioned issues and processes are the definition of irregularity.

332.   Prior to working the re-enlistment in 2008, Petitioner enlisted the help of his elected representatives by contacting Senator Frank Lautenberg's office regarding all of the aforementioned matters.

333.   On 31 October 2007 – Senator Lautenberg's office sent a letter to the Secretary of the Navy asking the Secretary to make investigation into all of these matters.

334. That letter has gone unanswered.

335. The point of contact in the Senator's office is Ms. Sheilah Greene at 856-338-8922.[49]

336. The re-enlistment process Petitioner has endured has gone on for almost 9 Months and is full of problems and last minute issues that have stymied his re-enlistment.

337. On 26 November 2008, Lieutenant General Coleman (DC/M&RA) denied Petitioner's re-enlistment without reason or rationale.

338. There was no rationale provided for the denial; therefore, the denial was arbitrary and capricious.

339. A decision that is arbitrary and capricious is an abuse of discretion.

340. When Lieutenant General Coleman abused his discretion, he violated Petitioner's rights.

341. The one constant and repetitive fact, supported by evidence, is that Petitioner should not have been discharged in 2001 and the officer that processed him agrees.

342. The petitioner has exhausted all remedies available.

**NDRB Processing 2008-2009**

343. In November 2008, petitioner submitted an application for upgrade to his other than honorable characterization of service.

344. There were over 100 issues submitted to the NDRB that were consolidated into 5 decisional issues.

345. Generally, the facts plead supra. were the facts relied upon by petitioner in this application for characterization upgrade.

346. On 22 December 2009, after personally appearing with counsel, petitioner's discharge was upgraded to general (under honorable conditions).

347.    The basis for the upgrade was that the petitioner should have been given the opportunity to be retained or retrained/retained and that the discharge characterization was too harsh.

**Reenlistment 2010**

348.    In January 2010, through counsel, petitioner received authorization from Damisch to begin the reenlistment process yet again.

349.    Both personally and through counsel, petitioner made contact with the Recruiting Station New Jersey operations officer, executive officer and commanding officer in an attempt to begin the reenlistment process. Each contact was rebuffed and the request was denied.

350.    Both personally and through counsel, petitioner contacted the Assistant Operations Officer for Enlisted Recruiting at Marine Corps Recruiting Command, Lieutenant Colonel Walsh, who reinitiated the reenlistment process by compelling Recruiting Station New Jersey to forward the petitioner's reenlistment paperwork to his office.

351.    Petitioner's reenlistment documents were reviewed by various staff offices at Marine Corps Recruiting Command and ultimately found their way onto the desk of Damisch.

352.    In February-March 2010, Damisch communicated through petitioner's counsel by email, that based upon, inter alia, petitioner's RE code, manpower overages in the Military Police occupational specialty, physical fitness scores, and petitioner's age – that petitioner would not be reenlisted.

353.    Petitioner's counsel requested a phone conference or personal meeting with Damisch to discuss this matter due to petitioner willingness to lateral move into another

occupational specialty, known constructive age calculations lowering petitioner's age to acceptable limits, and the physical fitness test. Damisch denied the request and rebuffed all further communication by petitioner's counsel.

354.   Petitioner's counsel sought assistance from Damisch's supervising attorneys office. After the initial introductory call and a promise to make inquiry and call back – Damisch's supervising attorneys office never called petitioner's counsel as promised and all further calls were rebuffed.

355.   The petitioner has exhausted all remedies available.

**BCNR 2010**

356.   In February 2010, petitioner began the process to apply for an upgrade to the petitioner's RE code based upon the upgraded characterization of discharge and the aforementioned substitution of erroneous and extraneous information into the 2004 application.

357.   The 2010 application was processed via MMER, Ms. Poleto, and the application was summarily denied the upgrade application in an opinion that contained erroneous information that was made in an arbitrary and capricious manner.

358.   Petitioner's counsel rebutted the erroneous information; however, without notice, MMER forwarded the application to the BCNR for review.

359.   MMER agreed there was erroneous information and issued a corrected copy – but arbitrarily and capriciously failed to comment on all substantive matters contained in the rebuttal.

360.   Between April-May 2010, BCNR summarily denied upgrade application in an opinion that was based erroneous information that was made in an arbitrary and capricious manner.

361.    Petitioner was never afforded an opportunity to review all accompanying documents that were sent to the BCNR and BCNR never forwarded the complete text of the MMER denial accompanying documents to give the petitioner an opportunity to review or comment.

362.    The petitioner has exhausted all remedies available.

**Reserve Reenlistment 2010.**

363.    Beginning in February 2010, petitioner began the process of attempting to reenlist in the Marine Corps Reserve in several different units in different occupational specialty.

364.    Both personally and through counsel, petitioner contacted Gunnery Sergeant Morales and Major Valdesuso – Prior Service/Reserve Recruiting – in Philadelphia, PA and Chicopee, MA.

**365.**    Major Valdesuso gave the authorization for petitioner to begin the recruiting process – knowing all of the facts and circumstances of petitioner service background.

366.    Each and every attempt to join a unit, both near and far, in any occupational specialty was rebuffed due to the RE 4 code that was awarded in 2001 as a result of the aforementioned erroneous processing of petitioner for court-martial.

367.    The petitioner has exhausted all remedies available.

368.    Petitioner, by and through undersigned counsel, respectfully moves this court to compel Department of the Navy officials to reinstate petitioner as a member of the United States Marine Corps under 28 USC §1331, 1361, and 1651.  As discussed below, the petitioner's due process rights guaranteed under the Fifth Amendment, Ninth Amendment, and/or Fourteenth Amendment were violated by respondents.

369.    Additionally, as a result of the actions of the Board for Correction of Naval Records and the United States Marine Corps, this is complaint for further relief under the

Administrative Procedures Act (5 USC §701 et. seq.) seeking an order compelling the Department of the Navy to correct petitioner's military records and restore petitioner's besmirched reputation by changing the petitioner's reenlistment code to RE-1.

**I.  The Petitioner's Due Process Rights Were Violated When His Commanding Officer Committed Errors In Processing Petitioner For A Special Court-Martial That Ultimately Led To Petitioner's Discharge And The Marine Corps Refused To Take Corrective Action.**

370.   Most decisions as to the composition, training, equipping, and control of the military are beyond judicial review. Ultimate responsibility for these decisions is vested in the legislative and executive branches. benShalom v. Sec'y of Army, 489 F. Supp. 964, 970 (E.D. Wis. 1980) *citing* U. S. Constitution, Art. I, Sec. 8, Cl. 16; Gilligan v. Morgan, 413 U.S. 1, 10-11, 93 S.Ct. 2440, 2445-2446, 37 L.Ed.2d 407 (1972); Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953).

371.   Strong policies compel the courts to give the military "the widest possible latitude" in the administration of personnel matters. Id *citing* Sanders v. United States, 594 F.2d 804, 813 (Ct.Cl.1979); Orloff v. Willoughby, *supra*; Mindes v. Seaman, *supra*.

372.   Restricted judicial review is not, however, the equivalent of no judicial review. Courts will review, without hesitation, cases in which it is alleged that the military violated the Constitution, applicable statutes, or its own regulations. benShalom at 971.

373.   "It is established, of course, that the federal courts have the power and the duty to inquire whether a military discharge was properly issued under the Constitution, statutes, and regulations." Matlovich v. Secretary of Air Force, 591 F 2d. 852, 859 (D.C. Cir. 1978); Sanders, supra, at 814; Hodges v. Callaway, 499 F. 2d. 417 (5th Cir. 1974).

**A. Legal Background**

## 1. 2001 Discharge

374.   In this case, Petitioner's discharge was not properly issued because the petitioner's Commanding Officer did not know he had other options for petitioner.  On multiple occasions, post discharge, the petitioner's Commanding Officer/Special Court-martial Convening Authority, Applegate, has stated and signed memoranda and related correspondence that he made errors in processing the petitioner for a Special Court-martial.

375.   Applegate had the misconception that the petitioner neither could continue to serve in the Marine Corps as a Military Police officer nor could petitioner be trained in a new occupational specialty.  Specifically, Applegate would have retained petitioner in the Marine Corps, but for his MOS.

376.   After discharging petitioner by accepting a separation in lieu of the court-martial he erroneously convened and at the request of the petitioner, in 2003-2004 Applegate counseled petitioner to get his reenlistment code upgraded for the purpose of the petitioner serving in the Marine Corps once again.[8]   Additionally, Applegate gave counsel and advice on the process to get petitioner's reenlistment code upgraded and took an active roll in submitting petitioner's request.  However, based upon the way that Applegate processed the request and the actions taken by Applegate and BCNR – the reenlistment code upgrade was denied.

## 2. 2008 Reenlistment

377.   After being denied by the BCNR, petitioner sought legal counsel and then again sought the assistance of Applegate in securing reinstatement (reenlistment) into the

---

[8] While Applegate put the petitioner though this process in 2003-2004 in an effort to get petitioner's reenlistment code upgraded, the method he used was flawed and the advice, counsel, and assistance was defective.

Marine Corps.   That process was successful up to the point wherein the Deputy Commandant of the Marine Corps, et al – interfered with petitioner's right to counsel.

378.    From the reinitiating of contact with Applegate, the defendants were fully aware that petitioner was represented by counsel and remained represented by counsel at every stage of the reenlistment process.  Petitioner's counsel liaised, negotiated, and advocated at every level for petitioner – from Applegate, the Deputy Commandant, and lawyers representing Manpower and Reserve Affairs/United States Marine Corps to the production recruiter, Military Entrance Processing Station and medical personnel.

379.    The final step in the reenlistment process was a meeting requested by the Deputy Commandant of the Marine Corps.  After petitioner's counsel scheduled the meeting with the Deputy Commandant's aide, the meeting was put on hold the very next day.  The Deputy Commandant created a new precondition to the meeting in that the petitioner's counsel could not be present, then modified it petitioner's counsel could not be in the Deputy Commandant's suite, then it was further modified to petitioner's counsel could not be in anywhere in the building, to the final modification that petitioner's counsel could not even drive petitioner to the meeting – but the Marine Corps would send a van to an undisclosed location to pick-up petitioner for the meeting.

380.    Based upon the denial of counsel, petitioner did not initially meet with the Deputy Commandant and later all requests to continue discussions were denied.  The denial of counsel, under these circumstances, violates the Sixth Amendment and Ninth Amendment rights of the petitioner and the petitioner was prejudiced severely by not being reenlisted.

**3. 2010 Reenlistment**

381.   In November 2008, the petitioner sought an upgrade to his discharge characterization of 2001.   In December 2009, the Naval Discharge Review Board upgraded petitioner's discharge to one under honorable conditions[9] and petitioner again, through counsel, sought reenlistment.   Mr. Thomas Damisch, the attorney assigned the legal representative of the United States Marine Corps in this matter, authorized reenlistment processing, after being authorized to begin the recruiting process, the petitioner was denied reenlistment upon known pre-existing matters – all of which were waiverable – all again at the Deputy Commandant level.

382.   Petitioner, through counsel, was told that unless matters changed, he would not be reenlisted.   Matters did change – for the betterment of petitioner, e.g. he propounded that he would lateral move into another occupational specialty.   At that point, Damisch refused further contact by petitioner's counsel.   After contacting Damisch's senior counsel and having an introductory phone call – Damisch's senior counsel indicated he would look into the matter and then refused further contact by petitioner's counsel.

383.   The continued denial of counsel, under these circumstances, violates the Sixth Amendment and Ninth Amendment rights of the petitioner and the petitioner was prejudiced severely by not being reenlisted.

**B. <u>Argument</u>**

384.   Mandamus is controlled by equitable principles.   It is an extraordinary writ, but its issuance is largely a matter lying within the discretion of the court to which the Petition is addressed. <u>benShalom,</u> at 970

385.   Generally, mandamus is an appropriate remedy if (1) petitioner has a clear right to the relief sought, i.e. reinstatement in the Marine Corps; (2) there is a plainly defined and

---

[9] General (Under Honorable Conditions)

peremptory duty on the part respondents to do the act in question, i.e. reinstate the petitioner; (3) there is no other adequate remedy available. id.

## 1. **Petitioner has a clear right to the relief sought, i.e. reinstatement in the Marine Corps.**

### a. **Errors were made in the processing of petitioner for discharge.**

386.    While at first blush, it appears petitioner was properly processed for discharge from the Marine Corps under Marine Corps Order P1900.16E; however, the rationale for the processing was constitutionally defective.

387.    At the time petitioner was being processing for separation, he was part of Security Battalion, Marine Corps Base, Quantico, Virginia.   Petitioner's occupational specialty was Military Police Officer, 5811.  During the time of his separation, petitioner had returned on his own volition from a mitigated period of Unauthorized Absence.  At the time of his return, his commanding officer, Applegate, had a policy that upon return from "desertion [sic] status [a Marine] had three options (1) go to a special court-martial, (2) be processed for an OTH discharge, and (3) convince me that he or she could regain the trust and confidence of being a Marine and serve honorably." Applegate 2-page letter

388.  Marine Corps Order P1900.16E provides at paragraph 6419 that a Marine may be separated upon his or her request in lieu of trial by special or general court martial if charges have been preferred with respect to an offense for which a punitive discharge is authorized *and* it is  determined that the Marine is *unqualified for further military service.* (emphasis added).

389. The commanding officer facially based his grounds to process petitioner for discharge on petitioner's unauthorized absence status for over 30-days, which allowed for the possibility of a punitive discharge. 10  USC §886. The commanding officer's *reason*

for *processing* petitioner for discharge, however, was that he wrongly believed that petitioner could neither be retrained in another occupational specialty nor retained otherwise – stating "[i]f I had been able to move [petitioner] to another MOS, I would have retained him in the Marine Corps." Applegate 2-page letter.

390. First, petitioner's disciplinary history did not foreclose his ability to serve in the occupational specialty of Military Police. Marine Corps Order 1200.17 page 3-381. Second, there is nothing in the Marine Corps publication library that would prohibit petitioner's commanding officer from submitting petitioner for a "lateral move" into another occupational specialty through formal schooling. Marine Corps Order 1220.5J. Third, there is nothing in the Marine Corps publication library that would prohibit petitioner's commanding officer from submitting petitioner for a "lateral move" into another occupational specialty through on the job training – including keeping petitioner at the same command. Marine Corps Order 1553.1B.

391. Upon his discharge, petitioner was stigmatized with an other than honorable discharge and further stigmatized with a reenlistment/reentry code 4.

392. Since petitioner's discharge, Applegate has repeatedly stated verbally and in writing that he made mistakes in processing petitioner for discharge. *See* Naval Discharge Review Board opinion MD09-2511 – Corrected.

**(1)  The violation of petitioners due process right deprived petitioner of his liberty interests.**

393.   "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." Board of Regents v. Roth, 408 U.S. 564, 569 (1972). A person deprived of either of these interests must be afforded some kind of a hearing. Id. at 570, n. 7.

394.    "Liberty" as referred to in the Due Process Clause of the Fourteenth Amendment
includes the right of "an individual to contract, to engage in any of the common
occupations of life, to acquire useful knowledge ... and generally to enjoy those privileges
long recognized ... as essential to the orderly pursuit of happiness by free men." Id at 572,
*quoting*, Meyer v. Nebraska, 262 U.S. 390, 399 (1923).

395.    Issuing the petitioner an other than honorable discharge and an unfavorable
reenlistment/reentry code imposed a very serious and devastating stigma.  While
petitioner's discharge characterization was upgraded in 2009 to general (under honorable
conditions), even that discharge and the remaining reenlistment/reentry code 4 continues
to stigmatize the petitioner.  The Supreme court held in Wisconsin v. Constantineau that
"[w]here a person's good name, reputation, honor, or integrity is at stake because of what
the government is doing to him, notice and an opportunity to be heard are essential."
Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971). Due Process demands that the
individual, whose liberty interest has been so implicated, be given an opportunity to clear
his name. May v. Gray, 708 F. Supp. 716, 721 (E.D.N.C. 1988).

396.    The petitioner's general (under honorable conditions) and reenlistment/reentry
code 4 does impose a stigma and, as such, petitioner has been deprived of a significant
liberty interest.  See May v. Gray, 708 F. Supp. 716, 722 (E.D.N.C. 1988).

397.    The court in May, supra, held that:

> One who is seeking employment and is asked to furnish
> background information and verification is hardly in a position to
> refuse the request if he wants the job. As the *Casey* court noted
> large employers routinely ask discharged service personnel for
> documentation verifying their service and discharge. "The truth of
> the matter is that military separation codes are known, understood
> and available to the part of society that count-i.e., prospective
> employers." Casey v. United States, 8 Cl.Ct. 234, 243; *see also*
> Boltwood affidavit re Army Regulation 635-5-1 "Separation
> Program Designations." The court concludes that the stigma which

will attach to plaintiff's record if the separation is completed implicates plaintiff's liberty interests. Id.

**b. The defendant interfered with the petitioner's right to counsel during the aforementioned 2008 reenlistment process which violated the petitioner's 6th Amendment and 9th Amendment rights to counsel and interfered with the petitioner's regulatory right to counsel.**

398.   In October 2008, Applegate assigned an attorney (Stone) to serve as a point of contact for the remaining issues present in petitioner's 2008 reenlistment. Once assigned, petitioner's counsel began to negotiate and liaise with Stone on issues like the correction of Petitioner's military record to correct mistakes made by Applegate in the 2001 processing – so that petitioner would have a "clean" record when he was reenlisted. During this same period, Defendant Coleman canceled all prospective meetings between Defendant Coleman and petitioner unless petitioner would attend the meeting without counsel.

399.   These aforementioned matters are follow-on actions of the petitioner, with assistance of counsel, that stem from criminal charges preferred to a Special court-martial under the direction of Applegate alleging a single violation of 10 U.S.C.A. § 886. Any service member charged at a special court-martial has a right to counsel. U. S. v. Annis, 5 M.J. 351, 353 (C.M.A. 1978) (holding that the right to effective assistance of counsel is extended to the military accused both by the Sixth Amendment to the Constitution and the Uniform Code of Military Justice.)

400.   Additionally, the corrective action sought in 2008-2010 was to correct the erroneous actions of Applegate in the separation in lieu of trial process afforded to the petitioner under paragraph 6419 of Marine Corps Order P1900.16E. In accordance with paragraph 6419.3b of Marine Corps Order P1900.16E, the Marine would have an

opportunity to consult with qualified counsel; therefore, in seeking to correct an erroneous processing the petitioner necessarily would have the same right to counsel with counsel – a right that was denied at the critical juncture of the process in 2008.

401.   The matter in 2008-2010 was one of correcting the erroneous action of Applegate in 2001 by re-enlisting the petitioner and, thereby, putting him in the position he held in 2001 at the time of separation.  The issue of Reenlistment Code determination is initially under the cognizance of the Deputy Commandant of the Marine Corps (Manpower & Reserve Affairs).  https://www.manpower.usmc.mil.  Even in this process – there is a right to counsel as evidence by the Department of Defense form dd149 and Secretary of the Navy Instruction 5420.196.[10]

402.   By the Deputy Commandant of the Marine Corps, Lieutenant General Ronald S. Coleman, denying the petitioner his right to have counsel present at the meeting that would effectuate end state purpose of pursuing discharge and reenlistment upgrades violated petitioners right to counsel under the 6th and 9th Amendment and service department regulations.

## c. The Defendants Violated Equal Protection Rights When He Was Treated More Harshly Than Others Similarly Situated For A Mistaken Rationale Or The Rationale Was Arbitrary And Capricious.

403.   In 2001, when Applegate processed petitioner for separation, Applegate treated the petitioner differently than other similarly situated Marines based upon erroneous, arbitrary and capricious decision-making resulting in petitioner being treated so unfairly that his constitutionally rights were violated.

---

[10] Available here:
http://doni.daps.dla.mil/Directives/05000%20General%20Management%20Security%20and%20Safety%20Services/05-400%20Organization%20and%20Functional%20Support%20Services/5420.193.pdf)

404.    The only reason that petitioner was processed for separation was Applegate's erroneous belief that the petitioner "was not a candidate for a new MOS and being sent to a new MOS school." Applegate 2-page letter. Applegate went on to say that if he could "move Scott to another MOS[11] I would have retained him in the Marine Corps. Id.

405.    As previously mentioned, there is nothing in any regulation that would have prohibited Applegate from sending the petitioner to a new occupational school as part of a lateral move or having him train in a new occupational specialty through on the job training. See Marine Corps Order 1200.17 page 3-381, Marine Corps Order 1220.5J and Marine Corps Order 1553.1B; See also Naval Discharge Review Board opinion MD09-2511 – Corrected. (holding that Applegate "could have retained the [petitioner]; or retained and offered the [petitioner] the opportunity to retrain in another MOS.")

406.    Similarly, there is nothing in the peitioner's background – even with the charges of unauthorized absence that would have prohibited petitioner from remaining in his Military Police MOS.

407.    As a result of Applegate's erroneous, arbitrary and capricious decision-making – petitioner was treated significantly and determinedly different than other similarly situated Marines.

**2. There is a plainly defined and peremptory duty on the part respondents to do the act in question, i.e. reinstate the petitioner.**

408.    If a discharge is found to be violative of the constitution, as it is in the petitioner's case, the implicit but clear non-discretionary duty of the defendant is to reinstate the petitioner upon learning of the unconstitutional nature of the discharge. See benShalom,n

---

[11] Military Occupational Specialty

at 970 (holding if a soldier's discharge is found to be violative of the Constitution, the implicit but clear non-discretionary duty of the respondents is to reinstate the soldier upon learning of the unconstitutional nature of the discharge.)

**3. There is no other adequate remedy available.**

409.    Petition has gone through every process available -- the normal recruiting channels with General Officers and members of the Senior Executive Service guiding the process; Naval Discharge Review Board, where he successfully obtained a discharge upgrade and access to veteran benefits; and the BCNR, see infra, where he was arbitrarily and capriciously rejected in his quest to have his reenlistment code upgraded.

410.    The petitioner's discharge in 2001 was unconstitutional. Petitioner's due process rights were violated when he was erroneously processed for discharge for an arbitrary and capricious reason, his right to counsel was violated when his lawyer was excluded from negotiations, and his equal protection rights were violated when he was treated disparately.

411.    Because petitioner's discharge was unconstitutional, the duty to reinstate petitioner back into the Marine Corps is clear. See benShalom, Supp. at 970.

C. **Conclusion.**

412.    The Petitioner's due process rights were violated when he was erroneously processed for a special court-martial when his commanding officer failed to understand the alternative options he had available to him.

413.    Additionally, the petitioner's right to counsel were violated on multiple occasions resulting in great prejudice.

414.    As such, based on the above, the court must direct and order the defendant to reinstate the petitioner on active-duty in the United States Marine Corps.

**II. The Board For Correction Of Naval Records Violated The Administrative Procedures Act When It Both Considered Evidence Extraneous To Petitioner's Submission And Acted In Decision Making That Was Arbitrary And Capricious In Denying Petitioner's Request To Upgrade His Reenlistment Code To Re 1.**

A. **Legal Background**

1. **Petitioner's 2003-2004 submission to the Board for Correction of Naval Records.**

415.    In 2003, petitioner contacted Applegate and requested assistance in reenlisting in the Marine Corps. Applegate told petitioner that he would help him reenlist and that getting his reenlistment code upgraded would make him eligible. Applegate told petitioner that submitting a petition to the Board for Correction of Naval Records (BCNR) – even with his then other than honorable discharge – was the proper course of action.

416.    Applegate, with the assistance of a Marine Lawyer (Shidel), had petitioner send a completed dd149 form, a personal letter from petitioner, and letters of recommendation directly to office of Manpower Management Evaluation Review (MMER) so Applegate and Shidel could retrieve the package.

417.    Shidel drafted a two-page letter of support for Applegate to sign and to be submitted on petitioner's behalf. Shidel forwarded a copy of the two-page signed letter to petitioner. Applegate/Shidel told petitioner that upon receipt of the documents at MMER, they would retrieve the package, review it, add the aforementioned two-paged signed letter, and submit the petition directly for petitioner. Applegate implied that with his position within Marine Corps Manpower, that the upgrade was essentially a lock.

418.   Unbeknownst to petitioner, when the petition was retrieved by Applegate/Shidel the two-page signed letter was substituted for a one-page signed letter that was less favorable and contained erroneous and false information that was derogatory.

419.   MMER and BCNR then considered the petition as submitted by Applegate/Shidel, including the extraneous document that petitioner never saw prior to his reenlistment code petition being denied.  Upon receipt of his BCNR records in late fall 2004, petitioner first learned of the betrayal.

2. Petitioner's 2010 submission to the Board for Correction of Naval Records.

420.   In 2009, petitioner sought and received an upgrade to the other than honorable discharge he received as a result of the erroneous decision making of Applegate.  The holding of the Secretary of the Navy's Naval Discharge Review Board NDRB was that his discharge characterization was upgraded because the petitioner was not given the opportunity for continued service and Applegate's signed memoranda and related correspondence that he made errors in processing petitioner for a special court-martial.

421.   Petitioner sought reconsideration of the BCNR petition submitted in 2004 under the guidance of Applegate, based upon the fact finding by the NDRB – that errors were made in the processing of petitioner for a court-martial, which led to the separation in lieu of trial, which further led to the reenlistment code assignment by Applegate.

422.   Despite the evidence presented and the adjudicated matters by the NDRB – a body covered under the Secretary of the Navy's Council of Review Boards – the BCNR erroneously opined that none of the aforementioned evidence contained no new factual information than that presented in 2004.  For that reason, the BCNR arbitrarily and capriciously denied petitioner request..   Further, petitioner was not offered the opportunity to appear before a board and the board considered the matter final.

B. **Argument**.

1. Petitioner's 2003-2004 submission to the Board for Correction of Naval Records.

423.    The consideration of extraneous matters outside of the petitioner's review is violative of governing regulation of BCNR, i.e. Secretary of the Navy Instruction 5420.193 enclosure 1, section 4, paragraph e(1).    Additionally, if an administrative review board like MMER and BCNR consider matters beyond the record, the action should be invalidated if there is substantial prejudice shown.    Dep't of Pub. Serv. Regulation, Pub. Serv. Comm'n, State of Mont. v. United States, 344 F. Supp. 1386, 1388 (D. Mont. 1972)

424.    The extraneous material, i.e. the one-page, signed document that the petitioner did not have an opportunity to review, contained derogatory information that substantially prejudiced the petitioner.    The one-page, signed letter stated that the petitioner was a *deserter* – which he was not – and that he was *returned* to Security Battalion – which he was not. (Emphasis added).

425.    Labeling someone a deserter (10 U.S.C. §885) is completely different and more serious allegation than Unauthorized absence (10 USC §886) – the charge petitioner was facing at the time of discharge.

426.    Petitioner was never alleged or thought to have been a deserter – only that he was in a period of unauthorized absence.    The petitioner returned to Security Battalion on his own volition.    Have a period of Unauthorized Absence terminated by apprehension is an enumerated aggravating factor under Article 86, Uniform Code of Military Justice, paragraph e(2)(d), maximum punishments.

427.   The action of the BCNR must be invalidated because the BCNR considered erroneous derogatory information that would resulted in BCNR denying the reenlistment code upgrade – which, it self, substantially prejudiced the petitioner.

2. Petitioner's 2010 submission to the Board for Correction of Naval Records.

428.   In F.C.C. v. Fox Television Stations, Inc., 129 S. Ct. 1800 (2009), the Supreme Court reiterated the review standards executive agency action. The Court held that the Administrative Procedure Act, 5 U.S.C. § 551 et seq., sets forth the full extent of judicial authority to review executive agency action permits the setting aside of agency action that is "arbitrary" or "capricious," F.C.C. v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1810 (2009), 5 U.S.C. § 706(2)(A). The Supreme Court characterized the standard of review as "narrow;" however, insisted that an agency "examine the relevant data and articulate a satisfactory explanation for its action." Id. citing Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 103 S.Ct. 2856 (1983).

429.   In the case of the petitioner, the BCNR did neither.  The BCNR reviewed the same materials considered in the 2004 petition.  The BCNR failed to articulate any consideration given to the fact that documents were surreptitiously included in petitioner's initial submission in 2004.  The BCNR failed to consider the findings of a recognized member entity of the Council of Review Boards.  The BCNR failed to give the petitioner the opportunity to appear at an in person hearing.

430.   C. **Conclusion.**

431.   The BCNR violated the petitioner's due process rights by allowing extraneous and, therefore, erroneous information into the BCNR review process without an opportunity to review or comment.  The BCNR acted in an arbitrary and capricious manner in denying the petitioner's 2004 and 2010 BCNR petition.  As such, and based

upon the above, the petitioner's RE code should be upgraded to RE 1 and that action should be directed by this honorable court.

Respectfully submitted,

ANTHONY J. SCIOLLA, JR.
Attorney for Petitioner, Scott DiDonato
801 Old York Road
Noble Plaza, Suite 219
Jenkintown, PA  19046
(215) 673-9222
Fax:  (215) 885-7155
e-mail:  ajsciollajr@msn.com


LAW OFFICES OF PHILLIP
STACKHOUSE, PLLC

PHILLIP STACKHOUSE
Attorney for Petitioner, Scott DiDonato

200 Valencia Drive, Suite 136
Jacksonville, NC  28546
(202) 577-7901/(910) 459-9652
Fax:  (202)204-5814
e-mail:  Stackhouse@militarydefender.com


C:\Data\AJSciolla\TOELK-DIDONATO\FEDERAL TORT CLAIMS ACT\Mandamus with numbers 7.22.doc